45 A.3d 208

**WASHINGTON HOME REMODELERS, INC.**

v.

**STATE of Maryland, OFFICE OF the ATTORNEY GENERAL, CONSUMER PROTECTION DIVISION.**

No. 82, Sept. Term, 2011.

Court of Appeals of Maryland.

May 22, 2012.

Levi S. Zaslow (Timothy F. Maloney of Joseph, Greenwald & Laake, P.A., Greenbelt, MD), on brief, for appellant.

Philip D. Ziperman, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen., and Elizabeth J. Koenig, Asst. Atty. Gen., Baltimore, MD), on brief, for appellee.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and ARRIE W. DAVIS (Retired, Specially Assigned), JJ.

ARRIE W. DAVIS (Retired, Specially Assigned), J.

We granted *certiorari* in this case to determine the scope of authority of the Attorney General's Consumer Protection Division (the Division) to issue administrative subpoenas in aid of its investigation into potential unfair and deceptive trade practices. *Washington Home Remodelers, Inc. v. Consumer Protection Div.*, 423 Md. 450, 31 A.3d 919 (2011). We shall hold that the Division has the authority to issue the adminis-

trative subpoena at issue in this case, and shall therefore affirm the circuit court's enforcement order.[1]

## INTRODUCTION

In this case, we are asked to address a problem of potentially overlapping agency jurisdiction in the context of "shared regulatory space."[2] The Division seeks documents that it claims are relevant to its investigation into potential unfair and deceptive trade practices that are within the ambit of its regulatory and enforcement authority under the Maryland Consumer Protection Act (CPA). *See* Md.Code (1975, 2005 Repl.Vol., 2011 Supp.), § 13–405 of the Commercial Law Article (Com.Law). Washington Home Remodelers (WHR), the target of the Division's investigation, has demurred, asserting that the Division has overreached by seeking discovery into matters in which the regulatory authority resides exclusively with either the Commissioner of Financial Regulation of the Department of Labor, Licensing and Regulation (DLLR) or the Maryland Home Improvement Commission under their respective enabling statutes.[3] WHR insists that the Division subpoena is therefore not authorized by law and maintains that the circuit court erred in ordering its enforcement. Because we shall hold that the Division's subpoena is authorized by the Consumer Protection Act, we need not delve into

---

**1.** The Maryland Consumer Protection Act (CPA) is set forth at Md.Code (1975, 2002 Repl.Vol., 2011 Supp.), §§ 13–301–13–501 of the Commercial Law Article (Com.Law). Com. Law § 13–405 authorizes the Attorney General, "[i]n the course of any examination, investigation, or hearing[,]" to "subpoena witnesses, administer oaths, examine an individual under oath, and compel the production of records, books, papers, contracts and other documents."

**2.** *See* Jodi Freeman and Jim Rossi, *Agency Coordination in Shared Regulatory Space*, 125 HARV. L.REV. 1131, 1134 (2012).

**3.** In this case, the Maryland Consumer Credit Reporting Agencies provisions of the Commercial Law Article, Md.Code (1975, 2002 Repl. Vol., 2011 Supp.), §§ 14–1201 *et seq.* of the Commercial Law Article (Com.Law), an analog of the federal Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* (2006 & Supp. II), and the Maryland Home Improvement Law, Md.Code (1975, 2004 Repl.Vol., 2011 Supp.), §§ 8–101—8–702 of the Business Regulation Article (Bus.Reg.).

conflicting investigatory prerogatives of separate administrative agencies.

## BACKGROUND

WHR is a licensed home improvement contractor based in College Park, Maryland. Acting on complaints from former WHR employees and consumers concerning WHR's sales solicitation practices, the Division initiated an investigation. Three former employees complained that WHR had misrepresented the individual licensing status of its sales people.[4] Consumers also alleged that WHR accessed their credit histories without their knowledge and consent before soliciting a business relationship. For example, as stated in the Division's brief, one consumer alleged that

On 3/4/08 Washington Home Remodelers contacted me by phone offering home remodeling services—including deck building. . . . The caller said they wanted to know if I would be interested in having a "free" estimate on a deck for my home. I told him that I would like an estimate. We scheduled an appointment for Sat. 3/8/08 @ 4 pm. . . . I was unable to keep that appointment so we rescheduled for Thurs. 3/13/08 @ 7 pm. On Wednesday, 3/12/08 I was notified by the fraud alert service that I use that my credit report had been accessed by Washington Home Remodelers. I was alarmed by this since I had not met with their representative nor given them any personal information or made a request over the phone or given them permission verbally or in writing to access my credit. On Thursday 3/13/08 I contacted [Washington Home Remodelers'] offices and spoke to Greg Troy, who identified himself as the Customer Service Manager. I told him that I was calling because I learned that they had accessed my credit without my permission and I was upset. I explained that I had neither met with their representative and had completed no

---

4. Bus. Reg. § 8–301(c) provides: "Except as otherwise provided in this title, a person must have a salesperson license or contractor license whenever the person sells a home improvement in the State."

paperwork nor request for their financing regarding a deck or any other service they provided. I told him I would be filing a complaint with the Maryland's [sic] Consumer Protection office because I thought this business practice was unlawful. He told me that they work through Equifax and apologized because 'someone jumped the gun' by running my credit report. I reminded him that each time someone's credit is accessed it affects their credit score. . . .

This was apparently not an isolated example. On May 29, 2009, a second prospective customer scheduled an appointment for an estimate for constructing a deck to his home, but, although no one appeared for the appointment, the prospective customer received an alert from the credit bureau that it had received an inquiry for his credit file, without his permission. On August 19, 2009, based on these complaints and those of former WHR employees, and acting on its perceived authority to investigate unfair and deceptive trade practices prohibited by the CPA, the Division served WHR with an administrative subpoena.[5]

---

**5.** The following are the documents and other information sought by the subpoena:

1. All documents that show your legal identity and organization, including, but not limited to, all articles of incorporation and all bylaws of any corporation.

2. All documents that show any trade name under which you have done business.

3. All documents showing the names, titles, addresses, and phone numbers of your current and former owners, directors, members, officers and employees. In lieu of providing the actual documents you may provide a list that contains the names, titles, addresses and phone numbers of each current or former owner, director, officer and employee.

4. All documents that list or describe the responsibilities of your current and former owners, officers, members, directors and employees. In lieu of providing the actual documents you may provide a list of the individuals and a description of their responsibilities and the inclusive dates of their employment.

5. All documents that show each entity in which you have and/or had an ownership interest or authority to control during the last ten (10) years. In lieu of providing the actual documents you may provide a list containing the names of the entities and a description of the extent of the ownership interest.

6. All documents that show each entity or person that has and/or had an ownership interest in you or authority to control you during the last ten (10) years. In lieu of providing the actual documents you may provide a list containing the names of the entities and a description of the nature and extent of the ownership interest.

7. All documents that refer or relate to any license or professional certification that you have held.

8. All documents that refer or relate to any professional licenses or certifications held by your employees including, but not limited to, all documents that refer or relate the licenses held by your sales persons required under Md.Code Ann., Bus. Reg. § 8–301, *et seq.*

9. All documents that: (i) list the name, address and phone number of any consumer to who you have sold any good or service since January 1, 2006; (ii) identify the goods or services purchased by the consumers; and (iii) identify the monies paid by the consumers for the purchase goods or services. In lieu of providing the actual documents you may provide an electronic database or list containing the name, address, and telephone number of any consumer who has purchased any goods or services from you since January 1, 2006, a description of the goods or services purchased by each consumer, the date of each purchase, and the date and amount of any payments you have received from each consumer.

10. All documents relating to your marketing, advertising and/or promotion of any good or service to consumers including, but not limited to, all versions of any advertisements, recordings, scripts and other documents that refer or relate to the content of any advertisement or promotion of any good or service to consumers.

11. All contracts and other forms you have used in connection with the offer and/or sale of goods and/or services to Maryland consumers.

12. All documents that reflect any appointments you have made with consumers since January 1, 2006, to offer and/or sell any home improvement good or service.

13. All forms and other standardized documents used by you to review or check consumers' credit scores, credit history, credit reports, or otherwise review their creditworthiness.

14. All forms and other standardized documents used by you to notify consumers of any check or review that you perform to review consumers' creditworthiness or their backgrounds.

15. All forms and other standardized documents used by you to notify consumers of any check or review that you perform regarding consumers' creditworthiness or their backgrounds.

16. All forms and other standardized documents you have used to obtain authorization from consumers to review their credit scores, credit history, credit reports, or otherwise review their creditworthiness.

17. All forms and other standardized documents you have used to offer or provide consumers financing or to assist consumers in obtaining financing from any third-party.

18. All contracts, agreements, or other documents that identify any relationship you have had with any lender, credit issuer, or credit reporting agency.

In response to this subpoena, WHR produced some of its form sales documents and sales agreements, but otherwise

19. All documents that refer or relate to any correspondence or other communications that you have had with any credit reporting agency or bureau since January 1, 2006.

20. All manuals, correspondence, memoranda, statements, and other documents, referring or relating to your policies or procedures relating to your offer and/or sale of goods and/or services to consumers.

22.[sic] All manuals, correspondence, memoranda, statements, and other documents, referring or relating to your policies or procedures relating to the contact or dealings that you and/or your agents or employees have or had with consumers.

23. All scripts, manuals, memoranda and other documents that were or are used by your employees when they have contact with consumers.

24. All manuals, correspondence, memoranda, statements, and other documents, referring or relating to your policies or procedures for checking consumers' credit scores, credit history, credit reports, or otherwise reviewing their creditworthiness. Please include in your response any such documents that refer or relate to your policies and procedures for reviewing consumers' creditworthiness prior to any sales appointments.

25. All manuals, correspondence, memoranda, statements, and other documents, referring or relating to your policies or procedures for financing consumers' purchase of home improvement services and/or home improvement goods.

26. All manuals, correspondence, memoranda, statements, and other documents, referring or relating to your policies or procedures relating to the licensure of your salespersons.

27. All documents that reflect the identities of any officers or employees who are authorized to make deposits to or withdrawals from any bank accounts maintained by you. In lieu of providing the actual documents you may provide a list containing the names of each employee or officer who is authorized to make deposits to or withdrawals from any bank accounts maintained by you, together with an identification of the accounts from which such employees or officers are authorized to make deposits or withdrawals.

28. All documents that refer or relate to any investigation of you and/or any of your employees by any judicial, administrative, government or law enforcement agency.

29. All documents that refer or relate to any lawsuits that have been filed against you.

30. All correspondence, memoranda, statements, and/or other documents, referring or relating to any complaints you have received from consumers or that have been filed against you by consumers.

31. All correspondence, memoranda, statements, and/or other documents, referring or relating to your response to any complaints you have received from consumers or that have been filed against you by consumers.

refused to comply further with the Division's demand. For example, WHR declined to provide documents that identified the licensing history of its current and former employees, information concerning its lending and credit practices, and the advertisements, scripts, forms and other documents it uses to communicate with consumers. Resisting any further disclosure, WHR maintained that the information sought was beyond the Division's authority, and contended that investigation and enforcement of the law regarding the licensure of its agents lies exclusively within the jurisdiction of the Maryland Home Improvement Commission and that the enforcement of the law proscribing unauthorized access to credit reports is a matter exclusively within the authority of the Commissioner of Financial Regulation of the DLLR. The information thus sought by the Division instead could only be requested by, and provided to, those latter agencies, WHR asserted.

On December 4, 2009, after informal efforts by the Division and WHR to resolve the dispute were unsuccessful, the Division sought judicial enforcement of its administrative subpoena by filing a Complaint for Enforcement of Administrative Subpoena in the Circuit Court for Prince George's County. The Division accompanied this filing with a motion for summary judgment. WHR, in turn, moved to dismiss and filed a cross-motion for summary judgment, based on its claim that the Division's subpoena was without legal authority.

Following a hearing on September 21, 2010, the circuit court, although initially agreeing with WHR, ultimately determined to enforce the Division's subpoena. The court, painting the Division's investigative authority with a broad brush, upheld the Division's authority to investigate the alleged unauthorized accessing of credit reports and employment of unlicensed salesmen. With a nod to the extensive reach necessary for an agency to address the potential adverse effects on consumers, the circuit court harbored

[n]o doubt the division has the investigatory authority regarding consumers and the consumer's welfare. And I think for me the salient word should be or phrase should be consumer welfare and everything turns on whether what the

division is doing is for the consumer welfare. They're not in this case they haven't charged anyone with anything. They're looking into complaints. And the legislature has determined that the division has the right to initiate an investigatory process to determine what is actually happening in the consumer area as far as consumers are concerned to see if in fact consumers are being taken advantage of by particular acts by companies.

*   *   *

[A]t the end of the day the balance goes in favor of the division because the legislature has given it the mandate to be the protector of the consumer.

WHR noted a timely appeal to the Court of Special Appeals, and, as noted above, this Court issued a writ of certiorari, before action by the intermediate appellate court, to consider the following questions presented [6]:

1. Does the Consumer Protection Division have investigative and enforcement authority over the access and use of consumer credit reports in Md.Code Ann., State Gov. § 14–1201, *et seq.* when that authority is specifically vested with the Commissioner of Financial Regulation of the Department of Labor, Licensing, and Regulation?

2. Does the Consumer Protection Division have investigative and enforcement authority over the Maryland Home Improvement Law, Md.Code Ann., Bus. Reg. § 8–101, *et seq.* when that authority is specifically vested with the Maryland Home Improvement Commission?

By contrast, the Division asks:

Did the circuit court correctly hold that the Division had authority under the Maryland Consumer Protection Act to issue a subpoena to investigate potential unfair or deceptive trade practices in consumer transactions involving the unli-

---

**6.** Where this Court is considering an appeal before action taken by the Court of Special Appeals, we "will consider those issues that would have been cognizable by the Court of Special Appeals." Md. Rule 8–131(b)(2).

censed sale of home improvement services and the unauthorized access of consumers' credit records?

## STANDARD OF REVIEW

■■■■ This Court has recognized the following "threefold test for determining the validity of a subpoena issued by an administrative agency" as set forth by the Supreme Court in *Oklahoma Press Publ'g Co. v. Walling*, 327 U.S. 186, 208, 66 S.Ct. 494, 505, 90 L.Ed. 614, 629 (1946): "Whether the inquiry is authorized by statute, the information sought is relevant to the inquiry, and the demand is not too indefinite or overbroad." *Banach v. State Comm'n on Human Relations*, 277 Md. 502, 506, 356 A.2d 242, 246 (1976). *See* Arnold Rochvarg, *Principles and Practice of Maryland Administrative Law*, § 5.7 at 62 (2011). This appeal invokes only the first element of the test, *viz.* whether the Division's subpoena is authorized by the CPA. Accordingly, our review of the circuit court's ruling on the petition to enforce the administrative subpoena in this instance is plenary.[7] The circuit court ruled that the Division acted within its statutory authority and, accordingly, entered summary judgment in favor of enforcement. This presents a question of law. It is also long-established that the authority of an administrative agency to issue investigative subpoenas derives from statute. *See Banach,* 277 Md. at 507, 356 A.2d at 246 (citing *United States v. Morton Salt Co.,* 338 U.S. 632, 642–43, 70 S.Ct. 357, 364, 94 L.Ed. 401, 410 (1950)); *Vulcan Waterproofers, Inc. v. Md. Home Improvement Comm'n,* 253 Md. 204, 210, 252 A.2d 62, 65 (1969). We recently stated within the context of reviewing a circuit court's summary judgment ruling:

---

**7.** Regardless of the eventual course of any administrative proceedings, the circuit court's entry of summary judgment in the proceedings to enforce the Division's subpoena is a final order that is properly before us. *See Unnamed Attorney v. Attorney Grievance Comm'n,* 303 Md. 473, 480–82, 494 A.2d 940, 943–44 (1985); *Barnes v. Comm'r of Labor & Industry, Div. of Labor & Indus., etc.,* 45 Md.App. 396, 400, 413 A.2d 259, 262 (1980), *aff'd on other grounds sub nom. Baltimore Bldg. & Constr. Trades Council v. Barnes,* 290 Md. 9, 427 A.2d 979 (1981).

This case presents a question of statutory interpretation, and therefore, we review the trial court's disposition through summary judgment under a non-deferential standard of review. *Walter v. Gunter*, 367 Md. 386, 392, 788 A.2d 609, 612 (2001 [2002] ) ("[W]here the order involves an interpretation and application of Maryland statutory and case law, our Court must determine whether the lower court's conclusions are 'legally correct' under a [non-deferential] standard of review."). The task of this Court, therefore, is to " 'determine whether the [circuit court's decision] was legally correct.' " *See Wash. Suburban Sanitary Comm'n v. Phillips*, 413 Md. 606, 618, 994 A.2d 411, 419 (2010) (quoting *Murphy v. Merzbacher*, 346 Md. 525, 530–31, 697 A.2d 861, 864 (1997)).

*Breslin v. Powell*, 421 Md. 266, 277, 26 A.3d 878, 885 (2011).

## DISCUSSION

### I.  Introduction

The gravamen of WHR's resistance to the Division's subpoena is that this sweeping inquiry lies beyond the coverage of the CPA because the Division seeks the production of information that relates exclusively to two other statutes: the Maryland Consumer Credit Reporting Agencies Act, Md.Code (1975, 2005 Repl.Vol., 2011 Supp.), §§ 14–1201 *et seq.* of the Commercial Law Article (Com.Law) and the Maryland Home Improvement Law, Md.Code (1975, 2004 Repl.Vol., 2011 Supp.), §§ 8–101–8–702 of the Business Regulation Article (Bus.Reg.).  In short, WHR avers, the Division has no business asking for the information at issue in this case.

WHR reminds us that "where one statutory provision specifically addresses a matter, and another more general statutory provision also may arguably cover the same matter, the specific statutory provision is held to be applicable and the general provision is deemed inapplicable." *See Lumbermen's Mut. Cas. Co. v. Ins. Comm'r*, 302 Md. 248, 268, 487 A.2d 271, 281 (1985).  WHR insists that, because section 14–1202(a) of

the Credit Reporting Agencies Act[8] is "a direct and explicit statutory authorization" that vests in the Commissioner of Financial Regulation of the DLLR the authority over investigation and enforcement actions involving the unlawful obtention of consumers' credit scores without first obtaining the consumers' authorization, the Division is without authority to investigate and enforce such actions.

To this point, appellant relies on legislative history which shows that the General Assembly specifically declined to enact an amendment conferring legislative and enforcement authority over Maryland credit reporting laws to the Consumer Protection Division. Senate Bill 500, which was proposed by the General Assembly in 1976 and later codified as Com. Law §§ 14–1201, *et seq., see* 1976 Md. Laws, Chap. 584, was recognized as mirroring the federal law with two main differences, one of which was the vesting of enforcement powers in

---

**8.** Section 14–1202 of the Credit Reporting Agencies Act outlines the permissible purposes of the disclosure of a consumer report and relevantly provides:

§ **14–1202. Permissible purposes of consumer reports; restrictions on sale or transfer.**

(a) *Permissible purposes.*—Subject to subsection (b) of this section and § 14–1205 of this subtitle, a consumer reporting agency may furnish a consumer report under the following circumstances and no other:

(1) In response to the order of a court having jurisdiction to issue the order;

(2) In accordance with the written instructions of the consumer to whom it relates; or

(3) To a person which the agency has reason to believe:

    (i) Intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer;

    (ii) Intends to use the information for employment purposes;

    (iii) Intends to use the information in connection with the underwriting of insurance involving the consumer;

    (iv) Intends to use the information in connection with a determination of the consumer's eligibility for a license or other benefit granted by a governmental instrumentality required by law to consider an applicant's financial responsibility or status; or

    (v) Otherwise has a legitimate business need for the information in connection with a business transaction involving the consumer.

Com. Law § 14–1202.

the Commissioner of Financial Regulation of the Department of Labor, Licensing and Regulation.[9] This recognition of enforcement powers in the Commissioner was in contrast to the treatment of a proposed amendment to the bill which would have provided for enforcement by the Division. The adoption of this amendment was declined. A different amendment, which would have explicitly classified a violation of Maryland credit reporting laws as an unfair and deceptive trade practice, was similarly declined by the General Assembly. That the Division is attempting to exert the sort of authority that the General Assembly specifically refused to grant, posits WHR, is manifest from the legislature's refusal to grant the Division enforcement authority over Maryland's credit reporting laws, its declination to define a violation of such laws as an "unfair or deceptive trade practice," and the fact that it adopted the bill in a form which gave authority over such matters to the Commissioner of Financial Regulation of the Department of Labor, Licensing, and Regulation.

Appellant likewise asserts that, because the Legislature, pursuant to Bus. Reg. §§ 8–208, 301,[10] has vested investigative and enforcement authority in the Maryland Home Improve-

---

9. WHR presents excerpts from the legislative history of the Consumer Credit Reporting Agencies Act to illustrate that the General Assembly resisted attempts to grant enforcement authority to the Division of Consumer Protection or to characterize a violation of the Act as an unfair or deceptive trade practice.

10. Bus. Reg. §§ 8–208 and 8–301 respectively govern the Home Improvement Commission's enforcement authority and licensing requirements for certain home improvement professionals and provide:
    § 8–208. **Administration and enforcement by Commission.**
    (a) The commission shall administer and enforce this title.
    § 8–301. **License required; exceptions.**
    (a) *Contractor license.*—Except as otherwise provided in this title, a person must have a contractor license whenever the person acts as a contractor in the State.
    (b) *Subcontractor license.*—Except as otherwise provided in this title, a person must have a subcontractor license or contractor license whenever the person acts as a subcontractor in the State.
    (c) *Salesperson license.*—Except as otherwise provided in this title, a person must have a salesperson license or contractor license whenever the person sells a home improvement in the State.

ment Commission with respect to the licensing of home improvement salespeople, the Consumer Protection Division is without authority to investigate the same matters. WHR complains that the Division is attempting to "seize enforcement power over Maryland's credit reporting laws[.]" Further, citing two decisions by the Court of Special Appeals, WHR insists that the Division's enforcement authority is more circumscribed. We turn to these decisions.

In *Davidson v. Microsoft Corp.*, 143 Md.App. 43, 792 A.2d 336, *cert. denied*, 369 Md. 571, 801 A.2d 1032 (2002), certain individual computer users and a local business filed a class action against Microsoft alleging that the software giant overcharged consumers for its Windows 98 computer operating system, and that its activities constituted violations of the Maryland Antitrust Act, Com. Law §§ 11–201 *et seq.* and the CPA.

The circuit court granted Microsoft's motion to dismiss and the Court of Special Appeals affirmed. The intermediate appellate court first concluded that the plaintiffs did not qualify for relief under the Antitrust Act and also held that no remedy would lie under the CPA because an antitrust violation was "not listed" in the roster of prohibited activities set forth in the CPA. *Microsoft*, 143 Md.App. at 56–57, 792 A.2d at 345.

In *Klein v. State*, 52 Md.App. 640, 452 A.2d 173 (1982), *cert. denied*, 295 Md. 440 (1983), Ray Klein appealed from the denial of his motion to dismiss five separate bribery indictments. He averred that the bribery charges were barred because he had been the subject of a prior related civil action under the CPA.

The Court of Special Appeals affirmed. That Court rejected Klein's argument that the criminal prosecution must be barred on double jeopardy and *res judicata* grounds. According to the intermediate appellate court, bribery does not constitute a deceptive or unfair trade practice, and it pointed out that bribery was not listed among the enumerated unfair trade practices set forth in the CPA:

While the Division of Consumer Protection has authority under § 13–204(12)(ii) to define unfair trade practices in addition to those specified in § 13–301, 62 Op. Att'y Gen. 535, 542 (1977), it has not included bribery. The section carefully enumerates what constitutes an unfair trade practice, and bribery is conspicuously absent. Notwithstanding the liberal interpretation to be afforded the Consumer Protection Act, § 13–105, we may not, by judicial fiat, add bribery to the list contained in § 13–301.

*Klein,* 52 Md.App. at 645, 452 A.2d at 176.

■ WHR's arguments overlook the fact that the "CPA provides a *nonexclusive* list of unfair and deceptive trade practices." *Golt v. Phillips,* 308 Md. 1, 8, 517 A.2d 328, 331 (1986) (emphasis added). Moreover, we recognized in *Consumer Prot. Div. v. Consumer Publ'g Co.,* 304 Md. 731, 745, 501 A.2d 48, 55 (1985), that the Division "acts as an arm of the Attorney General entrusted with broad powers to enforce and interpret the Consumer Protection Act[.]" In short, the fact that discrete activities may not be enumerated in section 13–301 does not preclude the investigation into whether that activity, or any adverse effects thereof, constitutes a violation of the CPA.[11]

WHR, throughout, frames the issue in terms of the Division's "investigation and enforcement" authority, whereas the Division correctly points out that its complaint in the circuit court merely sought to enforce the administrative subpoena that it had served on appellant, in an attempt to obtain information from which it could determine whether there are potential violations of the Consumer Protection Act. The Division maintains that its initial investigation is not an enforcement action, and it readily concedes that it has no authority to enforce the provisions of any statute but the CPA. The Division further responds, however, that it does have the regulatory authority to investigate matters which may poten-

---

11. This case does not require us to interpret the substantive reach of the CPA, state or federal laws pertaining to consumer credit reports, or any provision of the Business Regulation Article.

tially constitute unfair or deceptive trade practices, and contends that the unauthorized access and disclosure of consumer credit information and the deception of consumers as to the licensing status of home-improvement salesmen may well constitute violations of the CPA. The Division argues that it is, indeed, authorized to investigate complaints that may for the most part be based on issues outside of the Consumer Protection Act, provided that the activities complained of constitute a potential violation of the CPA. We agree with the Division and explain.

## II. The Legislation

The General Assembly, concerned that there was an erosion of public confidence in merchants who, in increasing numbers were engaging in deceptive practices during the course of consumer transactions (*i.e.*, sales of goods, services and the extension of credit), determined that it was necessary to take "strong protective and preventive steps to investigate unlawful consumer practices, to assist the public in obtaining relief from these practices, and to prevent these practices from occurring in Maryland." [12] Com. Law § 13–103(b)(3). In 1967,

---

12. Section 13–102 of the CPA sets forth legislative findings and purpose:

§ **13–102. Declaration of findings and purpose.**
(a) *Findings.*—(1) The General Assembly of Maryland finds that consumer protection is one of the major issues which confront all levels of government, and that there has been mounting concern over the increase of deceptive practices in connection with sales of merchandise, real property, and services and the extension of credit.
(2) The General Assembly recognizes that there are federal and State laws which offer protection in these areas, especially insofar as consumer credit practices are concerned, but it finds that existing laws are inadequate, poorly coordinated and not widely known or adequately enforced.
(3) The General Assembly of Maryland also finds, as a result of public hearings in some of the metropolitan counties during the 1973 interim, that improved enforcement procedures are necessary to help alleviate the growing problem of deceptive consumer practices and urges that favorable consideration be given to requests for increased budget allocation for increases in staff and other measures tending to improve the enforcement capabilities or increase the authority of the Division.

the General Assembly created the Division of Consumer Protection under the "authority of the Attorney General of Maryland." 1967 Md. Laws, Chap. 388. The new statute was then codified at Md.Code (1967 Supp.), Art. 83 ["Sales and Notices"], §§ 19–27. The Legislature revisited the statute in 1973 and granted the Consumer Protection Division stronger investigative authority by amending Art. 83, § 22(b). The purpose of the amendment was to

> provide stronger enforcement powers for the Attorney General *in the consumer protection law,* including the power to subpoena witnesses, administer oaths, examine individuals under oath, and compel production of records, books, papers, contracts, and other documents. . . .

1973 Md. Laws, Chap. 761 (emphasis in original).

■ The CPA is now found in Title 13 of the Commercial Law Article and constitutes remedial legislation that is intended to be construed liberally in order to promote its purpose of providing a modicum of protection for the State's consumers. In articulating the scope of the Division's authority to enforce the mandate of this legislation, Judge Raker observed for this Court:

> The Consumer Protection Division is a division of the Office of the Attorney General with a mandate to protect and promote the welfare of consumers. *See* § 13–201; § 13–

---

(b) *Purpose.*—(1) It is the intention of this legislation to set certain minimum statewide standards for the protection of consumers across the State, and the General Assembly strongly urges that local subdivisions which have created consumer protection agencies at the local level encourage the function of these agencies at least to the minimum level set forth in the standards of this title.

(2) The General Assembly is concerned that public confidence in merchants offering goods, services, realty, and credit is being undermined, although the majority of business people operate with integrity and sincere regard for the consumer.

(3) The General Assembly concludes, therefore, that it should take strong protective and preventive steps to investigate unlawful consumer practices, to assist the public in obtaining relief from these practices, and to prevent these practices from occurring in Maryland. It is the purpose of this title to accomplish these ends and thereby maintain the health and welfare of the citizens of the State.

Com. Law § 13–102.

204. As such, it is entrusted with broad powers to enforce and interpret the Consumer Protection Act. *See id.* The Attorney General is a constitutional officer, *see* Maryland Constitution Art. V, whose duties include prosecuting and defending cases on behalf of the State. *See Consumer Protection v. Consumer Publ.,* 304 Md. 731, 501 A.2d 48 (1985). The powers of the Division include the following:

"The statutory powers of the Division include the power to receive and investigate consumer complaints, initiate its own investigation of any possibly unfair and deceptive trade practice, issue cease and desist orders, adopt rules and regulations which further define unfair or deceptive trade practices or otherwise effectuate the purposes of the Act, and seek a temporary or permanent injunction in a civil enforcement proceeding §§ 13–204 and 13–403(c)(2). The statute further provides that the Division may 'exercise and perform any other function, power, and duty appropriate to protect and promote the welfare of consumers.' § 13–204(11)."

*Id.* at 745, 501 A.2d at 55.

*Consumer Prot. Div. v. Morgan,* 387 Md. 125, 140 n. 2, 874 A.2d 919, 927 n. 2 (2005) (emphasis added). *See Consumer Prot. Div. v. George,* 383 Md. 505, 513–14, 860 A.2d 896, 901 (2004).

### III. Investigatory Authority

■ The Division emphasizes that the purpose of the subpoena is to ascertain whether WHR potentially violated the CPA, and that this matter has not ripened into a formal administrative charge. Given the limited purpose of this preliminary inquiry, we agree that the Division has acted within its authority to investigate WHR by seeking the production of documents and information pursuant to the subpoena at issue.

In *Converge Servs. Grp., LLC v. Curran,* 383 Md. 462, 484 n. 19, 860 A.2d 871, 884 n. 19 (2004), we addressed the exercise of the Division's investigatory power, noting:

An administrative investigation pursuant to the CPA is initiated either after a consumer complaint or by the Division on its own initiative. § 13–204 of the Commercial Law Article. An investigation may proceed from a complaint from any potential or actual violation of the CPA; thus, the Division may begin an investigation on any complaint, *even one largely based on issues outside the CPA, if a potential violation of the CPA also occurred.* § 13–204. In the course of the investigation of a potential CPA violation, the Division may issue an administrative subpoena for a witness or compel production of documents. § 13–405. A public hearing may be held to determine if an alleged violator actually violated the CPA. § 13–403(a). This administrative hearing permits an alleged violator to present evidence and cross-examine witnesses. § 13–403(a)(3). Regardless of whether a violation of the CPA is found, the Division must state its findings of fact and law after the hearing. *Only in the event that a violation of the CPA is found by a preponderance of the evidence, may the Division order administrative remedies against the violator.* § 13–403(b). Thus, regardless of the outcome of alleged violations of another statute, the Division can only order a post-hearing administrative remedy under the CPA if the CPA itself is violated. Otherwise, it must issue an order dismissing the complaint. § 13–403(b)(2).

(Emphasis added).

In *Comm'n on Human Relations v. Freedom Express/Domegold, Inc.,* 375 Md. 2, 825 A.2d 354 (2003), we emphasized that

[t]he only prerequisites expressly set forth in Art. 49B, § 11, for the issuance and judicial enforcement of a Commission subpoena are certain formal requirements, proper service of process, and a finding that "the production of the books, papers, records and documents is relevant or necessary for the proceedings." (§§ 11(d)(1)(iii), 11(d)(1)(ii)). The requirement of "relevance" in § 11(d) is the same as the requirements of "relevance" or "reasonableness" which are

generally applied by the courts in determining whether to enforce administrative subpoenas.

*Freedom Express,* 375 Md. at 12, 825 A.2d at 360 (citations omitted).

▮ We reiterate that an administrative prosecution is not the function and purpose of the initial investigative subpoena. WHR insists that cases such as *Converge* illustrate that the Division is limited to investigating activities that are by their nature unfair or deceptive practices that are within the clear ambit of the CPA, and are not the subject of another statute.

▮ We believe that WHR's argument misses the point. At this stage, an investigative agency must retain the authority to obtain information that enables it to fulfill its statutory mandate, even in the context of "shared regulatory space." The Division, in the case before us, is authorized by section 13–405 of the CPA to do just that. The investigative authority flows from section 13–405, and, again, the Division may initiate an investigation to determine whether there are adverse consumer effects of an unauthorized credit reporting or salesperson licensing issue. We reiterate that, if the investigation demonstrates that the CPA is not violated, then the Division is required to "issue an order dismissing the complaint. § 13–403(b)(2)." *Converge,* 383 Md. at 484 n. 19, 860 A.2d at 884 n. 19. To require that the Division must demonstrate a CPA violation in the first instance would hamstring its investigative authority and render section 13–403(b)(2) of the CPA superfluous. Justice Robert H. Jackson's observation comes to mind:

We must not disguise the fact that sometimes, especially early in the history of the federal administrative tribunal, the courts were persuaded to engraft judicial limitations upon the administrative process. The courts could not go fishing, and so it followed neither could anyone else. Administrative investigations fell before the colorful and nostalgic slogan "no fishing expeditions." It must not be forgotten that the administrative process and its agencies are relative newcomers in the field of law and that it has taken and will continue to take experience and trial and

error to fit this process into our system of judicature. More recent views have been more tolerant of it than those which underlay many older decisions. *Compare Jones v. Securities & Exchange Comm'n,* 298 U.S. 1 [56 S.Ct. 654, 80 L.Ed. 1015 (1936)], with *United States v. Morgan,* 307 U.S. 183, 191 [59 S.Ct. 795, 83 L.Ed. 1211 (1939)].

The only power that is involved here is the power to get information from those who best can give it and who are most interested in not doing so. *Because judicial power is reluctant if not unable to summon evidence until it is shown to be relevant to issues in litigation, it does not follow that an administrative agency charged with seeing that the laws are enforced may not have and exercise powers of original inquiry.* It has a power of inquisition, if one chooses to call it that, which is not derived from the judicial function. It is more analogous to the Grand Jury, *which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not.* When investigative and accusatory duties are delegated by statute to an administrative body, it, too, may take steps to inform itself as to whether there is probable violation of the law.

*United States v. Morton Salt Co.,* 338 U.S. 632, 642–43, 70 S.Ct. 357, 363–64, 94 L.Ed. 401, 410–11 (1950) (emphasis added). *See Banach v. State Commission on Human Relations,* 277 Md. at 511–12, 356 A.2d at 249 (quoting *Morton Salt*). *See also EEOC v. Shell Oil Co.,* 466 U.S. 54, 81 n. 38, 104 S.Ct. 1621, 1637 n. 38, 80 L.Ed.2d 41, 64 n. 38 (1984) (stating "judicial review of early phases of an administrative inquiry results in 'interference with the proper functioning of the agency' and 'delay[s] resolution of the ultimate question whether the Act was violated.'") (quoting *FTC v. Standard Oil Co. of California,* 449 U.S. 232, 242, 101 S.Ct. 488, 494, 66 L.Ed.2d 416, 426 (1980)); *Endicott Johnson Corp. v. Perkins,* 317 U.S. 501, 509, 63 S.Ct. 339, 343, 87 L.Ed. 424, 429 (1943).

To be sure, the mischief that both the Credit Reporting Act and the Homeowner's Law exist to remedy is beyond the

direct purview of the CPA. The Division has conceded that point. Yet an investigation into possible unfair trade practices that may relate to activities proscribed by those statutes is properly the grist for the investigative mill. In the instant case, the Division began an investigation of WHR in response to multiple complaints it received in regards to WHR's requests for, and receipt of, consumer credit reports as well as its alleged employment of unlicensed salespeople. With regard to a determination that the employment of unlicensed salespeople could potentially constitute an unfair or deceptive trade practice under the CPA, if the investigation established that WHR dispatched unlicensed salespersons to the homes of prospective customers, the ultimate determination as to whether such a practice constituted a deceptive practice would be made at the conclusion of the investigation. The substance of the complaints filed with the Division provided reasonable grounds upon which to institute an investigation and to gather information to confirm or dispel the suspicion that WHR had committed an unfair or deceptive practice. CPA § 13–301(2)(ii).

Similarly, given the consumer complaints related to WHR's pre-solicitation or pre-sale requests for, and use of, consumer credit reports without permission from prospective customers, it would indeed be unfair or deceptive should the investigation ultimately establish that the acts, as described in the complaint, occurred. That harm was done as a result of accessing credit reports without permission is patent.[13] The complainant who had only made a preliminary inquiry regarding possibly engaging WHR's services had no reason to believe that the WHR employee contacted would access the consumer's credit score, causing potential economic harm. The WHR employee may cause the same detriment to the prospective

---

**13.** The Division cited materials stating the considerations which go into one's FICO score which explained that inquiries into a consumer's credit do have an impact on that individual's credit score. *See* FICO, *Understanding Your FICO Score*, p. 13 (Nov.2011), available at http://www.myfico.com/Downloads/Files/myFICO_UYFS_Booklet.pdf (last visited May 21, 2012).

consumer's credit score in a case in which the consumer, who, as a result of only scheduling an appointment for an estimate, prior to any discussion of price or method of payment, discovers that his or her credit has been accessed.

## CONCLUSION

We emphasize that the ultimate determination of what violations have been committed and which statutes, if any, have been violated, will be made at such time as any administrative proceedings are concluded.[14] At this juncture, howev-

---

14. At this juncture, we digress briefly to address the Division's assertion that WHR has failed to show that the "Division is palpably without jurisdiction in this case." In its reply brief, WHR challenges the applicability of the "palpably without jurisdiction" standard. This phrase has generally been invoked in the context of judicial review of administrative agency proceedings and the exhaustion of administrative remedies, and was thoroughly reviewed by Judge Harrell in *Heery International, Inc. v. Montgomery Cnty.*, 384 Md. 129, 137–38, 862 A.2d 976, 981 (2004). We there outlined the limits of the exhaustion issue before us in that case:

> We have long held that "[w]here an administrative agency has primary or exclusive jurisdiction over a controversy, the parties to the controversy must ordinarily await a final administrative decision before resorting to the courts for resolution of the controversy." *State v. Bd. of Contract Appeals*, 364 Md. 446, 457, 773 A.2d 504, 510 (2001); *Converge Services Group, LLC v. Curran*, 383 Md. 462, 481–82, 860 A.2d 871, 882 (2004) (stating that "[w]hen a statute explicitly directs an administrative process and remedy, our policy is set clearly by the General Assembly to maintain the uniformity of the regulatory scheme" by requiring exhaustion of administrative remedies); *see also Soley v. State Comm'n on Human Relations*, 277 Md. 521, 526–27, 356 A.2d 254, 257–58 (1976) (detailing the policy reasons behind the exhaustion requirement). This rule, however, is not without exceptions. For example, our case law indicates that exhaustion of administrative remedies will not be required when a party can demonstrate that an administrative tribunal is "palpably without jurisdiction." *See, e.g., State Comm'n on Human Relations v. Freedom Express/Domegold, Inc.*, 375 Md. 2, 19, 825 A.2d 354, 364 (2003) (finding that "this Court has consistently taken the position that judicial review of [an] issue must await a final administrative decision unless 'the agency is "palpably without jurisdiction" ' ").

The case before us, however, is not a judicial review of an administrative proceeding, but a judicial action to enforce the Division's investigative subpoena. There are no administrative remedies yet to invoke, or exhaust. The goal of the Division at this juncture is to develop a record basis for potential enforcement action. WHR's goal in turn is to

er, during the incipient stages of its inquiry and before the filing of any enforcement action, the Division is authorized to conduct the investigation into the adverse consumer effects of the practices that prompted the issuance of the subpoena before us.

■ Our holding in this case does not require that courts must enforce every administrative subpoena. We made abundantly clear, in *Banach v. State Commission on Human Relations*, 277 Md. at 506, 356 A.2d at 246, that a court that considers a request to enforce an administrative subpoena must determine "[w]hether the inquiry is authorized by statute, the information sought is relevant to the inquiry, and the demand is not too indefinite or overbroad." The challenge to the instant subpoena is confined to the first element,[15] and Com. Law § 13–405 provides an answer to that.

The circuit court did not err by entering summary judgment in favor of the Division and thus enforcing the subpoena.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED.**

**COSTS FOR PRINTING APPELLEE'S RECORD EXTRACT TO BE PAID BY APPELLEE;[16] BALANCE OF COSTS TO BE PAID BY APPELLANT.**

---

prevent, or at least forestall, any enforcement under the Consumer Protection Act.

**15.** During oral argument, counsel for appellant acknowledged that appellant was not challenging the breadth of the subpoena, only the Division's authority to issue it.

**16.** On January 23, 2012, this Court, having considered the Motion of the Consumer Protection Division for Leave to File Appellee's Record Extract, Appellant's Opposition to Appellee's Motion for Leave to File Record Extract and the Cross–Motion to Strike Appellee's Record Extract, issued an Order granting the Division's motion pursuant to Maryland Rule 501(e), but, simultaneously, instructed the Clerk of the Court that the decision "who will bear the cost of its printing (in whole or in part), pursuant to Maryland Rule 8–607(b)," would be reserved "until oral argument and the decision of the case." Md. Rule 8–607 provides, in pertinent part:

**Assessment of costs.**

(a) **Allowance and allocation.** Unless the Court orders otherwise, the prevailing party is entitled to costs. The Court, by order, may allocate costs among the parties.

(b) **Unnecessary material.** *When unnecessary material has been included in a record extract or appendix,* the Court may order that the costs of reproduction be withheld, apportioned, or assessed against the attorney or unrepresented party who caused the unnecessary material to be included. (Emphasis added).

Appellant opposed Appellee's Motion for Leave to File Record Extract, citing examples in appellee's record extract that it contended were both "duplicative materials ... and/or lacking in independent relevance materials." Upon our review, we agree that much of the material in appellee's record extract submitted as an appendix to its brief is duplicative to that in appellant's record extract and/or was not otherwise materially relevant in the disposition of this appeal. Accordingly, we shall assess the costs of printing appellee's record extract submitted as an appendix to its brief against appellee.